IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JULIE N. MOUNT,

        Plaintiff,

    vs.                                Civil Action 2:12-CV-943
                                            Judge Watson
                                            Magistrate Judge King

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

### I.   Background

This is an action instituted under the provisions of 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security denying plaintiff's applications for disability insurance benefits and supplemental security income. This matter is now before the Court on *Plaintiff Julie N. Mount Statement of Specific Errors* ("*Statement of Errors*"), Doc. No. 12, the Commissioner's *Opposition to Plaintiff's Statement of Errors*, Doc. No. 18, and plaintiff's *Reply*, Doc. No. 20.

Plaintiff Julie Mount filed her applications for benefits on September 11, 2008, alleging that she has been disabled since September 1, 2008. *See PAGEID* 152-56. The applications were denied initially and upon reconsideration, and plaintiff requested a *de novo* hearing before an administrative law judge.

An administrative hearing was held on May 3, 2011, at which plaintiff, represented by counsel, appeared and testified, as did Lynn

M. Kaufman, who testified as a vocational expert. *PAGEID* 79-80.  In a decision dated June 14, 2011, the administrative law judge concluded that plaintiff was not disabled from September 1, 2008, through the date of the administrative decision. *PAGEID* 71.  That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on August 20, 2012. *PAGEID* 47.

Plaintiff was 23 years of age on the date of the administrative law judge's decision. *See PAGEID* 71, 152.  She has a limited education, is able to communicate in English, and has past relevant work as a sales associate. *PAGEID* 69.  Plaintiff was last insured for disability insurance benefits on September 30, 2009. *PAGEID* 64.  She has not engaged in substantial gainful activity since September 1, 2008, her alleged date of onset of disability. *Id.*

## II.  School Records

Plaintiff graduated from high school in May 2006 without having failed any classes. *PAGEID* 333.  She was assigned to some special education classes, *see PAGEID* 341, and completed modified classes in a marketing program at a career center. *PAGEID* 334.  Plaintiff performed "well" at the career center, but needed help with reading and spelling. *Id.*  Plaintiff was also provided a tutor and extended time to complete assignments. She was permitted to use a calculator and spell checker, she worked in a small group setting, and tests were read to her. *PAGEID* 334-35, 351-54.

School evaluations describe plaintiff as (1) very motivated in the classroom and achieving successful progress in the general curriculum, (2) "a hard worker who works daily to the best of her

2

ability. She perseveres even when frustrated, and is not afraid of a challenge," (3) slowed by reading and spelling difficulties but very responsible in turning in work and constantly aware of times, dates and getting things done, and (4) "a very conscientious student [who]completes all her assignments and is always prepared. She works fairly independently, mostly asking questions only for clarification." *PAGEID* 346, 350-52. Plaintiff's special education teachers noted occasional behavioral problems related to her verbal aggressiveness and her tendency to complain about required tasks. *PAGEID* 347-48. On standardized school testing administered in March 1996, plaintiff achieved the following scores: WISC-III (intelligence) 87 ("Low Average"), WJ-R Broad Reading 63 ("Well Below Average"), WJ-R Broad Math 87 ("Low Average"), WJ-R Broad Writing 61 ("Well Below Average"), Vineland (Adaptive Behavior) 68 ("Well Below Average"). *PAGEID* 347. The school psychologist commented, "Adaptive behavior was collected and found to be well below average, but attention difficulties and impulsive behavior were thought to contribute to this low classroom assessment." *Id*.

## III. Medical Evidence

In 2006 and 2007, plaintiff complained of chronic pain in her back, especially with prolonged standing, walking, or sitting. *See PAGEID* 257-69. A March 9, 2006 MRI showed disc dehydration along with minimal to mild central disc bulge at L5-S1. *PAGEID* 265. A November 9, 2006 discography was concordant for pain and indicated a partial annular tear posteriorly at L5-S1 with a negative controlled discogram at L4-5. *PAGEID* 262-63.

3

Mark A. Fulton, M.D., performed a decompression laminectomy, fixation with interbody fusion on January 26, 2007. *PAGEID* 267. On February 26, 2007, Dr. Fulton described plaintiff as "do[ing] remarkably well since surgery," and noted that her preoperative symptoms, including the chronic severe sense of pressure in her low back, had largely resolved. *PAGEID* 257. Plaintiff did report "some occasional pain down the posterior thigh on the right side, but even that she sa[id] is considerably better." *Id.*

On September 15, 2008, plaintiff saw Dr. Fulton after she was thrown from a four-wheeler and it "wound up landing on her lower back." *PAGEID* 453. The wound from the accident had "healed very nicely," but plaintiff's back was "fairly tender to palpation" and she had a positive straight leg raise on the right. *Id.* Plaintiff also reported that "she had some trouble with some nagging intermittent hip pain on the right side about a year ago but she really did not seek any specific treatment for that." *Id.*

An October 6, 2008 MRI and x-ray of the lumbar spine revealed status post laminectomy and posterior lumbar interbody fusion with pedicle screw fixation at L5-S1. *PAGEID* 455-56. Dr. Fulton did "not see anything worrisome on her imaging studies;" the "fusion appear[ed] to be solid," the hardware was "in good position," there was no evidence of instability, the adjacent segment discs appeared to be healthy with no evidence of complication, and there was no "specific injury related to her [four-wheeler] accident." *PAGEID* 458-59. Dr. Fulton recommended a course of trigger point injections to address a right side contusion and chronic inflammatory problem. *Id.*

4

W. Jerry McCloud, M.D., completed a physical residual functional capacity assessment on behalf of the state agency on November 7, 2008. *PAGEID* 479-86.  According to Dr. McCloud, plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for six hours in an 8-hour workday, and sit for six hours in an 8-hour workday.  *PAGEID* 480.  Dr. McCloud also opined that plaintiff could frequently stoop, kneel, crouch, and crawl.  *PAGEID* 481.

Linda Hall, M.D., another state agency physician, reviewed the record and, on April 2, 2009, affirmed Dr. McCloud's assessment. *PAGEID* 540.

Plaintiff saw neurosurgeon David S. Knierim, M.D., FACS, on November 13, 2008 for "pain in the right buttock going down the back to the right knee." *PAGEID* 488-89.  Plaintiff complained that her "back pain did not really get better" after her previous surgery and was aggravated by sitting, standing, and lying for an extended period of time. *Id.*  Dr. Knierim recommended surgery because he thought plaintiff "may have a tethered cord syndrome." *Id.*

Plaintiff underwent a lumbosacral laminectomy with release of tethered cord on December 10, 2008. *PAGEID* 494-98.  In January 2009, plaintiff reported continued pain in the right buttock. *PAGEID* 500-01.

Plaintiff began physical therapy for her back at Advanced Therapy Specialists in January 2009.  She reported being limited to 20 minutes of walking a day, five to ten minutes of standing a day; she could sit "most of the day." *PAGEID* 520.  Plaintiff reported on February 11,

5

2009 that therapy was "helping a lot" and, on February 13, 2009, that she was "feeling a lot better." A progress report dated February 17, 2009 characterized her progress as "poor." *PAGEID* 527-28.

Plaintiff continued to report back pain in 2010 and 2011. *See e.g., PAGEID* 600, 608, 618, 624, 674, 683, 687. An April 2010 MRI of the lumbar spine showed "[s]tatus post L5 bilateral laminectomies and L5-S1 fusion with normal appearance of the hardware and osseous structures. No evidence of recurrent disc, impinging epidural fibrosis or progressive degenerative changes." *PAGEID* 620. An April 2010 MRI of the cervical spine showed ligamentous hypertrophy at C1-2, but was otherwise unremarkable. *PAGEID* 622.

Plaintiff began treating at Six County, Inc., on April 16, 2008, for depression. *PAGEID* 415-28, 542. She reported mood swings, distractibility, anxiety, crying and depression, which she attributed primarily to difficulty with reading and spelling. *PAGEID* 417, 422. She reported visiting with friends and having two "really supportive" friends. *PAGEID* 418. Plaintiff was diagnosed with bipolar I disorder, most recent episode depressed. *PAGEID* 424, 542. on September 11, 2008, Kent Davis, D.O., diagnosed an affective disorder, NOS, and prescribed medication and continued counseling. *PAGEID* 415-16, 542.

Bonnie Katz, Ph.D., completed a psychiatric review technique form and a mental RFC assessment on behalf of the state agency on October 20, 2008. *PAGEID* 461-77. Dr. Katz opined that plaintiff has moderate limitations in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace.

6

*PAGEID* 471. Plaintiff has moderate limitations in her ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (5) work in coordination with or proximity to others without being distracted by them, (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (7) interact appropriately with the general public, (8) accept instructions and respond appropriately to criticism from supervisors, (9) get along with coworkers and peers without distracting them or exhibiting behavioral extremes, (10) respond appropriately to changes in the work setting, and (11) set realistic goals or make plans independently of others. *PAGEID* 475-76. Plaintiff is not significantly limited in the remaining nine of 20 categories of functioning. *Id*.

Jennifer Swain, Psy.D., another state agency psychologist, reviewed the record and, on January 30, 2009, affirmed Dr. Katz's assessment. *PAGEID* 510.

Plaintiff was next evaluated at Six County, Inc., on February 25, 2010. Plaintiff reported a depressed mood "once in a while but not too bad right now," paranoia, anxiety, inability to focus or maintain concentration, and inability to sleep. *PAGEID* 652-54. She was diagnosed with bipolar I disorder, most recent episode depressed, moderate. *PAGEID* 656.

Plaintiff presented to Erin Roylance, D.O., at Six County, Inc., on March 15, 2010. *PAGEID* 646-50. Plaintiff's chief complaint was "[a] lot of anger." *Id.* Dr. Roylance diagnosed borderline intellectual functioning; major depressive disorder, recurrent, moderate; generalized anxiety disorder; attention deficit hyperactivity disorder; post-traumatic stress disorder; insomnia; nicotine dependence; and learning disorder, NOS. *PAGEID* 649. She assigned a Global Assessment of Functioning ("GAF")[1] of approximately 55. *Id.* Plaintiff reported improvement on April 5, 2010; she was not as fearful at night and believed that her medication was helping her anxiety, depression, and stress; however, she reported continuing frustration and a low stress tolerance. *PAGEID* 644-45. On May 17, 2010, plaintiff reported that "her sleep [wa]s good," her focus was good, her attention was better, and that she was able to get her driver's license. *PAGEID* 642-43. On June 21, 2010, plaintiff reported that she was more aggravated and meaner. *PAGEID* 640-41.

Keli A. Yee, Psy.D., consultatively examined plaintiff at the request of a county agency and completed a disability assessment report and mental functional capacity assessment on April 8, 2010. *PAGEID* 665-73, 677. Plaintiff reported reduced attention, concentration, motivation, and energy, depressive symptoms two to

---

[1] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning . . . ."

*Norris v. Comm'r of Soc. Sec.*, No. 11-5424, 2012 WL 372986 at *3 n.1 (6th Cir. Feb. 7, 2012).

three times per week, and crying spells "every once in a while."
*PAGEID* 671.  On the WAIS-IV, plaintiff achieved a verbal
comprehension score of 68, a perceptual reasoning score of 75, a
working memory score of 69, a processing speed score of 74, and a full
scale IQ score of 61.  *PAGEID* 671.  Dr. Yee diagnosed a major
depressive disorder, moderate, recurrent; attention deficit disorder,
combined type; and learning disorder, NOS, and borderline intellectual
functioning.  *PAGEID* 672.  She assigned a GAF of 59.  *Id*.  According
to Dr. Yee, plaintiff's "ability to handle daily stressors, or deal
with others is moderate to markedly impaired at this time due to the
severity of her current mood symptoms."  *PAGEID* 671.  "Cognitively,
[plaintiff] would be able to perform in the simple to low moderate
task range, and would likely have difficulties due to reduced
attention problems."  *PAGEID* 672.  Dr. Yee further opined that, in 20
areas of functioning related to understanding and memory, social
interaction, and adaptation, plaintiff was moderately limited in 13
areas, markedly limited in three areas, and not significantly limited
in four areas.  *PAGEID* 665.

A mental residual functional capacity ("RFC") questionnaire was
completed by Six County Inc., on July 30, 2010.  *PAGEID* 662-64.  The
form, which appears to have been signed by Dr. Roylance, represents
that, in 16 areas of functioning related to social interaction,
sustained concentration and persistence, and adaptation, plaintiff was
moderately limited in one area, markedly limited in eight areas and
extremely limited in six areas; she had no limitation in one area.
*PAGEID* 663-64.

9

IV.  **May 3, 2011 Administrative Hearing**

Plaintiff testified at the administrative hearing that she is a high school graduate who took only special education classes.  *PAGEID* 84-85.  Plaintiff has two children, ages six and 16 months, and she had lived with her boyfriend and two children for the two years prior to the hearing.  *PAGEID* 85-86.

Plaintiff testified that it took her four years to obtain her driver's license.  *PAGEID* 87, 109-10.  She failed the test at least ten times, and passed only with medication having the test read aloud to her.  *Id*.  Plaintiff now drives three to four times per week.  *Id*. She drove one hour to the administrative hearing, stopping only once to stretch.  *PAGEID* 88.

Plaintiff testified that she can lift 30 pounds, stand and walk for 10 to 15 minutes before needing to sit down, sit for 10 to 15 minutes before pain in her right hip requires her to stand up, stand and or walk a total of one hour in an 8-hour workday, and sit for a total of one hour in an 8-hour workday.  *PAGEID* 94-95.  She wakes up angry three days per week and stays angry through the middle of the evening.  *PAGEID* 104.  She also has crying spells two to three times per week, along with problems concentrating, focusing, and organizing. She does not understand the television shows she watches.  *PAGEID* 105, 107-08.  Plaintiff does not take care of her own finances, but she can count change.  *PAGEID* 89.

Plaintiff spends a typical day "[s]itting and standing, sitting and standing," and spends approximately two hours lying down.  *PAGEID* 95.  She goes to bed between one and two a.m., and she wakes up at

10

7:30 a.m. to get her son ready for school. *PAGEID* 99, 103. Plaintiff spends time with her daughter throughout the day and performs household chores with breaks. *Id*. Specifically, plaintiff washes dishes and does laundry, sweeps floors, cooks small dinners, goes grocery shopping, weeds the garden, bathes, showers, and grooms herself cares for her two children. *PAGEID* 100. Plaintiff takes her two children to a lake 20 minutes from her house almost every day in the summer to watch them swim. *PAGEID* 102.

The vocational expert testified that plaintiff has past relevant work as a sales associate. *PAGEID* 110-17. Asked to assume a claimant with plaintiff's vocational profile and the RFC eventually found by the administrative law judge, the vocational expert testified that such a claimant could not perform plaintiff's past relevant work but could perform about 35% of unskilled medium work (3,800 jobs locally), about 25% of unskilled light work (4,200 jobs locally) and about 20% of unskilled sedentary work (675 jobs locally). She gave as examples of such jobs the positions of cleaner (1,500 jobs locally); laundry worker (400 jobs locally); and packer (750 jobs locally). *PAGEID* 116. Asked to assume the assessments of Dr. Roylance and Dr. Yee, the vocational expert testified that such a claimant could not engage in gainful employment. *PAGEID* 118.

## V.  Administrative Decision

The administrative law judge found that plaintiff's severe impairments consist of lower back pain, status post fusion L5-S1 in 2006 and laminectomy with release of tethered cord in 2008; anxiety; depression; borderline intellectual functioning; attention deficit

11

hyperactivity disorder and learning disorder. *PAGEID* 64. However, the administrative law judge also found that plaintiff's impairments, whether considered singly or in combination, neither meet nor equal a listed impairment, including Listing 12.05C, which addresses mental retardation based on I.Q. scores. *PAGEID* 65-67. Specifically, the administrative law judge found that "the record as a whole does not indicate the type of deficits in adaptive functioning contemplated by listing 12.05." *PAGEID* 67.

The administrative law judge went on to find that plaintiff has the residual functional capacity ("RFC") to

> [p]erform less than the full-range of medium work as defined in 20 CFR §§ 404.1567(c) and 416.967(c) with the following abilities and limitations: (1) able to lift 50 pounds occasionally and 25 pounds frequently; (2) able to stand and walk six hours in an eight-hour workday; (3) able to sit six hours in an eight-hour workday; (4) able to frequently stoop, kneel, crouch, and crawl; (5) able to perform simple tasks; (6) able to occasionally interact with others; (7) precluded from interacting with the general public; and (8) limited to low stress work (no strict production quotas or time pressures) and relatively static changes that can be easily explained with clear performance expectations.

*PAGEID* 67. Although this RFC precluded plaintiff's past relevant work, the administrative law judge relied on the testimony of the vocational expert to find that plaintiff is able to perform a significant number of jobs in the national economy despite her lessened capacity. *PAGEID* 70-71. Accordingly, the administrative law judge concluded that plaintiff was not disabled within the meaning of the Social Security Act from September 1, 2008, through the date of the administrative law judge's decision. *PAGEID* 71.

**VI.  Discussion**

12

Pursuant to 42 U.S.C. § 405(g), judicial review of the Commissioner's decision is limited to determining whether the findings of the administrative law judge are supported by substantial evidence and employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389 (1971); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Buxton v. Haler*, 246 F.3d 762, 772 (6th Cir. 2001); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). This Court does not try the case *de novo*, nor does it resolve conflicts in the evidence or questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, this Court must examine the administrative record as a whole. *Kirk*, 667 F.2d at 536. If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if this Court would decide the matter differently, *see Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Longworth,* 402 F.3d at 595.

Plaintiff argues, first, that the administrative law judge erred in concluding that plaintiff does not meet the requirements of Listing 12.05C. *Statement of Errors*, pp. 7-12. Specifically, plaintiff argues that the administrative law judge erred by limiting the assessment of "adaptive skills [that] Ms. Mount could perform," to

13

"her ability to perform regular household chores and activities of daily living," and "not whether or not she had two comorbid adaptive skill deficits as regulation requires." *Id*. Plaintiff complains that the administrative law judge did not consider plaintiff's "significant deficits in functional academic skills," such as taking special education classes, failing portions of the 9th grade Ohio proficiency test, failing her driver's license test, and having difficulty reading and comprehending written materials. *Id*. Plaintiff also argues that the administrative law judge should have considered the consistency between plaintiff's work behavior and her school records. *Id*. at p. 10.

Listing 12.05 requires, under appropriate circumstances, a finding of disability based on a claimant's mental retardation:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when . . . (C) [the claimant has demonstrated] a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C). A claimant must establish three elements in order to satisfy Listing 12.05C: that she experiences "significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the developmental period" (i.e., the diagnostic description); (2) that she has a "valid verbal, performance, or full scale IQ of 60 through 70;" and (3) that she suffers from "a physical or other mental

14

impairment imposing an additional and significant work-related limitation of function." *Id*. *See also Foster v. Harris*, 279 F.3d 348, 354-55 (6th Cir. 2001).

The administrative law judge expressly recognized qualifying IQ scores in the record. *PAGEID* 67. However, the administrative law judge went on to find that the record did not "indicate the type of deficits in adaptive functioning contemplated by listing 12.05. . . ." *Id*.

> [T]he record as a whole does not indicate the type of deficits in adaptive functioning contemplated by listing 12.05, particularly in light of the fact that the claimant performs household chores such as washing dishes, laundry, sweeping, cooking small meals, and grocery shopping, weeds her flower garden, cares for her two young children, cares for herself and her own personal hygiene, takes her children to the lake every day in the summer to watch them swim, checks the news and weather on the internet, drives three to four times per week, drove from one hour away to the hearing, apparently attends her doctor's visits alone or with her child, transports her children to their doctor's appointments, is able to count change, has a detailed understanding of the medications she takes and why she takes them, and is generally described as being cooperative and having logical thought processes and fair insight/judgment by her treating providers.

*Id*. (citations omitted).

"Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). *See also Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009). The administrative law judge found that plaintiff had only "mild" limitations in activities of daily living and "moderate" limitations in social functioning and in concentration, persistence, or pace, and

15

that plaintiff did not have "the type of deficits in adaptive functioning contemplated by listing 12.05." *PAGEID* 65-67. Substantial evidence supports the administrative law judge's finding in this regard.

First, although plaintiff was enrolled in special education classes in school and had difficulty reading and spelling, she graduated from high school in May 2006 without failing any classes, performed "well" in her career center classes, had positive teacher reviews, and played on the basketball team. *See PAGEID* 333-54. Second, plaintiff was diagnosed with borderline intellectual functioning, rather than mental retardation, by Dr. Roylance and Dr. Yee, *PAGEID* 649, 672, and no medical provider has diagnosed mental retardation.  Finally, plaintiff's testimony at the administrative hearing and the medical evidence suggests that she is able to manage normal activities of daily living. *See e.g.*, *PAGEID* 85-110 (testimony that plaintiff performs household chores, weeds her garden, takes care of her two children and her personal hygiene, drives three to four times per week, takes her children to a lake 20 minutes away nearly every day in the summer, and goes grocery shopping); *PAGEID* 418 (plaintiff reported visiting with friends and having two "really supportive" friends).  This substantial evidence supports the administrative law judge's finding that plaintiff did not exhibit deficits in adaptive functioning initially manifested during the developmental period.  See *Justice v. Comm'r of Soc. Sec.*, No. 12-3150, 2013 WL 645957, at *4 (6th Cir. Feb. 22, 2013); *Hayes*, 357 F. App'x at 677 ("[T]he record shows that Hayes's adaptive skills are not

16

deficient.  She cares for herself and her husband; cooks meals, does laundry, and shops; manages her finances; and takes public transportation."); *West*, 240 F. App'x at 698.

Plaintiff next argues that the administrative law judge erred by not following the treating physician rule when evaluating the opinion of Dr. Roylance.  *Statement of Errors*, pp. 15-20.  The opinion of a treating provider must be given controlling weight if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Even if the opinion of a treating provider is not entitled to controlling weight, an administrative law judge is nevertheless required to determine how much weight the opinion is entitled to by considering such factors as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the extent to which the opinion is supported by the evidence, and the consistency of the opinion with the record as a whole.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Moreover, an administrative law judge must provide "good reasons" for discounting the opinion of a treating provider, *i.e.,* reasons that are "'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007)

17

(quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).  This

special treatment afforded the opinions of treating providers

recognizes that

> "these sources are likely to be the medical professionals
> most able to provide a detailed, longitudinal picture of
> [the claimant's] medical impairment(s) and may bring a
> unique perspective to the medical evidence that cannot be
> obtained from the objective medical findings alone or from
> reports of individual examinations, such as consultative
> examinations or brief hospitalizations."

*Wilson,* 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)).

In the case presently before the Court, plaintiff treated with

Dr. Roylance four times between March 15, 2010 and June 21, 2010.

*PAGEID* 641-50.  A mental residual functional capacity assessment dated

July 3, 2010, which appears to have been completed by Dr. Roylance,

represents that, in 16 areas of functioning related to social

interaction, sustained concentration and persistence, and adaptation,

plaintiff was moderately limited in one area, markedly limited in

eight areas, extremely limited in six areas; there was no limitation

in one area.  *PAGEID* 663-64.  The administrative law judge recognized

Dr. Roylance as a treating provider, but afforded her opinion only

"very little weight" in determining plaintiff's RFC.  *See PAGEID* 69.

The administrative law judge's analysis of Dr. Roylance's opinion

does not violate the treating physician rule.  The administrative law

judge provided specific reasons for assigning very little weight to

Dr. Roylance's opinion:

> [Dr. Roylance's opinion is] inconsistent with the treatment
> records as a whole, which reveal that the claimant is
> generally noted to have a normal affect, logical thought
> process, fair insight and judgment, cooperative/pleasant
> demeanor, and an appropriate/good mood, and because [Dr.
> Roylance's assessment is] inconsistent with her activities

18

of daily living and level of adaptive functioning as set
forth above.

*Id.* (citations omitted).  *See also PAGEID* 65-67 (evaluating
plaintiff's activities of daily living and level of adaptive
functioning).  Although the administrative law judge's analysis is
succinct, it is sufficiently specific as to the weight given to Dr.
Roylance's opinion and the reasons for assigning "very little weight"
to that opinion.  Under the circumstances, a formulaic recitation of
factors is not required.  *See Friend v. Comm'r of Soc. Sec.*, 375 F.
App'x 543, 551 (6th Cir. 2010) ("If the ALJ's opinion permits the
claimant and a reviewing court a clear understanding of the reasons
for the weight given a treating physician's opinion, strict compliance
with the rule may sometimes be excused.").

Further, the administrative law judge's reasons for assigning
very little weight to Dr. Roylance's opinion is supported by
substantial evidence.  Significantly, Dr. Roylance's treatment notes
describe plaintiff as having a "logical" thought process, "bright and
reactive" affect, normal motor sensitivity, cooperative behavior, and
fair insight and judgment.  *PAGEID* 640-41.  *See also PAGEID* 642
(logical thought process, fair insight and judgment, cooperative
behavior, good focus); *PAGEID* 644 (logical thought process,
cooperative behavior, fair insight and judgment); *PAGEID* 649 ("The
patient is casually dressed and groomed.  I estimate her intelligence
to be approximately below average.  She was alert, oriented X 4.
Behavior is cooperative.  Mood is 'pretty good.'  Affect is reactive
and variable.  Psychomotor activity is normal to increased.  Speech
was clear, eye contact was good and thought process was logical.

Thought content was free from any suicidal or homicidal ideation.  She denied any auditory or visual hallucinations.  Her insight and judgment are fair.").  Dr. Roylance's treatment notes also reveal that plaintiff responded well to treatment and medication.  *See PAGEID* 640-45.  Plaintiff reported that she was not as fearful at night, "sleep [wa]s good," focus was good, attention was better, she was able to get her driver's license, and she believed that her medication was helping her anxiety, depression, and stress. *Id*.  Moreover, the administrative law judge evaluated in extensive fashion plaintiff's activities of daily living and level of adaptive functioning and, as discussed *supra*, those findings enjoy substantial support in the record.

It is well-settled that the Commissioner's decision, when supported by substantial evidence, must be affirmed even if the plaintiff's position is also supported by substantial evidence.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007).  Because the administrative law judge correctly applied the standards of the treating physician rule to her assessment of Dr. Roylance's opinion, and because substantial evidence supports her findings, the Court finds no error with the Commissioner's decision in this regard.

The administrative law judge accorded "great weight" to the opinions of Drs. Katz and Swain, the state agency psychologists.  Plaintiff contends that the administrative law judge erred in that regard because those opinions were based on an incomplete review of the record. *Statement of Errors*, pp. 12-15.  Plaintiff specifically argues that the opinions of Drs. Katz and Swain were made without

20

reviewing most of the psychological evidence now in the record, *i.e.*, Dr. Roylance's treatment notes from four dates between March 15, 2010 and June 21, 2010, Dr. Roylance's mental RFC assessment dated July 30, 2010, *see PAGEID* 640-64, and Dr. Yee's examination report and mental RFC assessment dated April 8, 2010, *PAGEID* 665-73. *Statement of Errors*, pp. 13-14. Plaintiff's arguments are not well taken.

"There is no regulation or case law that requires the [administrative law judge] to reject an opinion simply because medical evidence is produced after the opinion is formed." *Williamson v. Comm'r of Soc. Sec.*, No. 1:11-cv-828, 2013 WL 121813, at *7 (S.D. Ohio Jan. 9, 2013). "Indeed, the regulations provide only that an [administrative law judge] should give more weight to an opinion that is consistent with the record as a whole." *Id.* (citing 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4)). In the case presently before the Court, the administrative law judge had the opportunity to review the entire record, including Dr. Roylance's treatment notes from March 15, 2010 through June 21, 2010, and yet she gave more weight to the opinions of Drs. Katz and Swain because they were "supported by and consistent with the record as a whole," whereas the opinions of Drs. Roylance and Yee were "inconsistent with the treatment records as a whole." *PAGEID* 69. Plaintiff does not object to the administrative law judge's evaluation of Dr. Yee's opinion and, as discussed *supra*, the administrative law judge did not err in assigning very little weight to Dr. Roylance's opinion because it was inconsistent with her treatment notes. Plaintiff also fails to demonstrate that Dr. Roylance's treatment notes contain new observations or findings that

21

were inconsistent with the records upon which Drs. Katz and Swain relied.

In short, and having carefully considered the entire record in this action, the Court concludes that the decision of the Commissioner is supported by substantial evidence.  It is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and that this action be **DISMISSED.**

If any party seeks review by the District Judge of this *Report and Recommendation,* that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation,* specifically designating this *Report and Recommendation,* and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *Smith v. Detroit Federation of Teachers, Local 231 etc.,* 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

June 13, 2013                                   *s/Norah McCann King*_____
                                                Norah M<sup>c</sup>Cann King
                                                United States Magistrate Judge